This is a proceeding under a writ of habeas corpus, in which the petition, return, and proof present the following case:
The petitioner is, and has been for five or six years, a local preacher of the Methodist Episcopal Church, South, duly licensed as such according to the rules of his church. It is a part of the discipline of this church that the license of a local preacher must be given by (393) the Quarterly Conference and signed by the president of the Conference, and must be renewed every ecclesiastical year. A local preacher is a minister of his church, and his duty is to preach and perform such other duties as may be assigned by his presiding elder or preacher in charge; but, until he is ordained as a deacon, he cannot administer the sacraments of his church. He is not entitled to any salary or pay for preaching or for the performance of his other ministerial duties. The petitioner was, prior to 17 February last, and has been ever since that time, located at the city of Raleigh, and has been constantly and regularly engaged in preaching every Sunday, alternately, to two congregations in the country, near the city, and at the hospitals, and also performing other ministerial duties, by attending class meetings, etc., all under the superintendence of Dr. Craven, his preacher in charge. He has received no salary or pay from his church or his congregations, but has supported himself from the income of a hotel in the city of Raleigh, of which he is the owner and manager.
Having been enrolled as a conscript and carried to Camp Holmes, the petitioner claims to be discharged under an act of the Confederate Congress, ratified on 17 February, 1864, which grants an exemption from military service in the army of the Confederate States to "every minister of religion authorized to preach according to the rules of his church, and who, at the passage of this act, shall be regularly employed in the discharge of his ministerial duties." The commandant of conscripts for this State denies his right, and insists upon retaining him in custody as a conscript under a regulation adopted by the Bureau of Conscription, to the following effect: "If the party is a regularly licensed minister, authorized to preach according to the rules of his sect, and that is his only business, he is entitled to exemption. If, however, he *Page 252 
depends for support on any other business, even if he should preach regularly, he is not entitled to exemption."
(394) That the case of the petitioner is obviously within the letter of the act of Congress cannot be denied. He is, according to the policy of his church, a minister of religion, duly authorized to preach, and he was, at the time of the passage of the act of Congress, regularly employed in the discharge of his ministerial duties. He is, therefore, entitled to be exempted from the performance of military service, unless the Bureau of Conscription is authorized, by law, to make a regulation other than that prescribed in the act of Congress, by which he shall be held as a conscript, or in construing the words of the act the Bureau has adopted a construction which is in accordance with its spirit, though not within its strict letter. I cannot find in the act any authority conferred upon the Bureau of Conscription to frame regulations upon this subject; and I cannot suppose that it sets up a claim to an independent power of legislation. In making provision for carrying the act into effect, the Bureau must ascertain its meaning, and, in doing so, must necessarily put a construction upon its language. That construction, though, is not conclusively binding upon the persons upon whom the act is to operate, for they have an undoubted right to appeal to the courts of law for redress, and it is the decisions of such courts alone which can finally settle the disputed point. The true and only inquiry before me, then, is whether the Bureau of Conscription has adopted the proper construction of the act in question, according to the intention of those who framed it — that is, according to the reason and spirit of it.
I have already remarked that the case of the petitioner is obviously within the letter of the act of Congress. This being so, it is incumbent upon the Government to show that it is not also within its reason and spirit, for it is the first among the fundamental rules for the (395) interpretation of laws to construe words in their usual and most known signification. If the words be dubious, then we may resort to other means for ascertaining the will of the Legislature, among which is that of considering the reason and spirit of the law, or the cause which moved the Legislature to enact it. See 1 Bl. Com., 59 and 61. Supposing, then, that there is some dubiousness in the meaning of the act under consideration, let us inquire what was the motive which induced members of Congress to pass it. About that there cannot be the slightest doubt. Most manifestly it was to afford to all who should not be called into the field — to the men, women, and children who should remain at home — the services of all the ministers of religion, of every grade in every denomination, who were duly authorized to preach, and who, when the act was passed, were regularly employed in the discharge of their ministerial duties. Can any good reason be given why these *Page 253 
ministrations may not be useful and productive of much good, though rendered by unpaid ministers? In the ecclesiastical polity of the M. E. Church, South, the local preachers form, as I learn, the most numerous class of their ministers. They occupy an important though it may be an humble field of labor, and are deemed essential in the scheme of that church, as furnishing the means whereby "the poor have the gospel preached to them." The fact that they take nothing from the coffers of their church for their support renders that body much more able to sustain those who are laboring in the higher grades of the ministry. These unpaid ministers are thus enabled to effect much good, both by what they do and by what they abstain from doing. In working for nothing of an earthly nature and supporting themselves, they have, as was well said by Messrs. Winston and Lewis, the counsel for the petitioner, an illustrious example in St. Paul, the greatest preacher whom the world has ever known, who worked with his own hands at his occupation of a tent-maker, that his support might not be a burden to the (396) churches of Corinth and Ephesus. See Paley's Horae Paulinae, ch. 3, No. 6. Has this great apostle ever been considered as having forfeited any of the rights as a preacher by reason of such forbearance and self-denial? On the contrary, has he not furnished to all succeeding ages an additional proof of the divinity of his mission and of the sincerity of his devotion to it, by showing that amidst the severest of trials, persecutions, and afflictions he labored not for the riches and honors of this world, but for the temporal and eternal good of his fellow-men, and for that crown of glory which his faith assured him was laid up for him in heaven? From these considerations I am led to believe the ground upon which the Bureau of Conscription would exclude from the exemption contained in the act of 17 February, 1864, that class of preachers to which the petitioner belongs, was not within the contemplation of Congress, and ought not, therefore, to control the decision of the question now before me.
But there is, no doubt, another class of ministers of religion, having authority from their respective sects to preach, to whom it might, perhaps, be properly applied. I allude to those ministers of different denominations who, being in affluent circumstances, preach occasionally and from time to time as their ministerial services may be required, without receiving any compensation therefor. In analogy to In re Grantham, ante, 73, in which it was decided that under the act of 11 October, 1862, a mechanic was not entitled to exemption from military service unless he followed a trade as his regular occupation and employment, it may be that such ministers of religion should not be exempted under the act of February, 1864. Cases of this latter kind were probably in the minds of the Bureau of Conscription when they adopted the *Page 254 
regulation to which I have referred. But it is manifest that this class of cases differs essentially from that in which the petitioner is embraced.
We have in this State an act which requires that the rites of (397) matrimony shall be performed by justices of the peace or by "ordained ministers of the gospel of every denomination." See Rev. Code (1856), ch. 68, secs. 1, 2. I feel quite sure that there is not a judge in the land who would for a moment feel himself at liberty to decide that a marriage was void because the ceremony had been celebrated by an ordained minister, who depended for support upon some other business than that of his ministry.
The conclusion to which I have come in favor of the petitioner derives additional support from the fact that under the act of October, 1862, which is almost in the precise terms of the last act, no person holding the same position in his church as that occupied by the petitioner has, so far as I have heard, ever been enrolled and called into the military service as a conscript.
My order is that the petitioner be discharged, and that his costs be paid by the defendant.
Chapel Hill, 8 August, 1864. *Page 255 
EXTRA TERM
*COMMENCING ON 26 OCTOBER, 1864
* This term was appointed by the Chief Justice under the act of the General Assembly passed at the adjourned session of 1864, chapter 5.